[Civ. No. 7526. Second Appellate District, Division One.—March 6, 1933.]

A. L. EACRETT, Respondent, v. MAX ZIMMON, Appellant.

Max Schleimer for Appellant.

Robert H. Wallis and Richard Hartley for Respondent.

CONREY, P. J.—The complaint in this action is in two counts. The first count stated a cause of action for money had and received by the defendant for the use of the plaintiff. The second count alleged the existence of a partnership between the plaintiff and the defendant; the dissolution of said partnership; and that defendant wrongfully withheld from the plaintiff a stated amount of money, being the plaintiff's share of the assets of the partnership. The court in its decision found against the existence of the alleged partnership, and adjudged that the plaintiff take nothing by the second cause of action. On the first count judgment was entered in favor of the plaintiff in the sum of $30,000, with interest, etc., and from this judgment the defendant appeals.

On July 15, 1924, letters patent were issued to the plaintiff upon an invention described as "Score Registering Devices for Golf and the like". Thereafter he assigned a one-third interest in the patent to James A. Armstrong, and another one-third interest to Howard M. O'Malley. In July, 1927, the plaintiff was introduced to the defendant and succeeded in interesting the defendant in said invention, so that defendant expressed a desire to buy the rights of Armstrong and O'Malley. This resulted in a sale of those interests, for which defendant paid to those parties the sum of $1500. The assignments, however, were made to the plaintiff, although the defendant paid the consideration therefor. It was then agreed that a corporation would be

formed, to which plaintiff would transfer the patent. Pursuant to this arrangement a written contract was executed of date *September 3, 1927*. In this contract after a recital that Eacrett and Zimmon were the sole owners of said invention, and that Zimmon was about to undertake the financing and organization of a corporation to be formed for the manufacture, distribution and sale of the patented article, it was agreed as follows: "First: The sum of Thirty thousand ($30,000.00) dollars cash, shall be paid to Alfred L. Eacrett by the corporation that will be organized for the manufacture, distribution and sale of the article described in the above patent; but under no circumstance is it intended by the parties hereto that the said Max Zimmon shall be personally liable for the payment of this amount. The above payment shall be due and payable to the said Alfred L. Eacrett when the machinery is installed and ready for operation in the plant to be opened for the manufacture of the article above described." The remaining parts of the contract included a provision for the appointment of Eacrett as vice-president of the corporation and manager of manufacturing operations; for the delivery to Eacrett of five per cent of the total shares issued, all as part consideration of his interest in the patent, and his transfer of said patent to the corporation, and for further specified considerations to be paid to Eacrett at a later time out of the surplus profits of the enterprise, etc.

Shortly after the execution of said contract the proposed corporation was formed. The patent was assigned on November 8, 1927, by Eacrett to Zimmon, and shortly thereafter by Zimmon to the corporation.

The contract above mentioned was a personal contract between Eacrett and Zimmon. Under date *March 8, 1928*, another contract was entered into between Eacrett and the corporation. This contract was signed by Eacrett and by "Max Zimmon, Pres. The Golf Score Watch Co. Inc." This contract, after reciting the execution of the contract of September 3, 1927, and that Eacrett and Zimmon, the owners of the aforesaid patent, had duly transferred all their title and interest in the patent to said corporation, further recited that it was the desire of both parties to cancel and rescind the aforesaid agreement and substitute a new agreement therefor. Therefore it was now agreed that "Firstly the agreement of

September 3rd, 1927, by and between Alfred L. Eacrett and Max Zimmon is hereby cancelled and rescinded." It was then further provided that said corporation, in lieu of said former agreement, would pay to said Eacrett certain "royalties" and a "salary consideration" as therein stated.

Under date *March 12, 1928*, another contract was executed between Eacrett and the corporation. This contract recited, in substance, that whereas Eacrett had assigned said patent to the corporation "upon the terms and conditions set forth in an agreement dated September 3, 1927, and it is the desire of both parties to rescind the same and to substitute this agreement therefor. Now therefore," etc. The terms following were, in substance, that the agreement of September 3, 1927, "by and between the party of the first part and the party of the second part", be hereby rescinded, be made void and of no effect; that in lieu of the former agreement the corporation now agrees to pay to Eacrett the sum of $150,000 payable out of the proceeds to be derived from the sales of the manufactured articles, at rates and at the times specified in this agreement.

Under date *December 8, 1928*, an agreement in writing was entered into between Max Zimmon and one William Drusin. Eacrett was not named as a party to this contract, but immediately following the signatures of Zimmon and Drusin there appears a consent signed by Eacrett as follows: "I consent to the foregoing. A. L. Eacrett." From the recitals in the beginning of this contract it appears that Drusin, on or about January 5, 1928, had forwarded to said corporation $45,000, intending that $35,000 thereof be paid to Zimmon "for the balance due him", and the balance to be used by the corporation on account of expenses; that the corporation has paid to Zimmon the sum of $35,000 on behalf of Drusin for said balance due to Zimmon; that Zimmon and Drusin had entered into agreements, and modifications of agreements, relating to the holdings, division of dividends and advances to the said corporation, and to matters incidental thereto; that Zimmon had been requested to execute certificates causing transfers of stock certificates issued, and had refused to do so; and that other disputes had arisen between the parties thereto; and "the parties hereto are desirous of setting forth herein their respective holdings" in said corporation. Now, therefore, it

was agreed between the parties thereto, as follows: The contract then proceeds in much detail to arrange for a reorganization of the corporation. This was to include some changes in the personnel of the board of directors and other officers of the corporation; and certain changes in the by-laws; and an employment of Zimmon as manager of the corporation. Also, there were provisions for further moneys to be advanced by Drusin for the use of the corporation; and providing conditions and methods of repayment by the corporation of indebtedness to Zimmon, and of indebtedness to Drusin. It was then provided that the parties to this agreement would enter into a pooling stock agreement, the details of which were set forth, covering the stocks owned respectively by Zimmon and Drusin in said corporation. It was then provided that the corporation would enter into an agreement in writing with Eacrett restating the terms of payment to be made by the corporation to Eacrett as royalties on his invention, "until the total sum of One Hundred Fifty Thousand ($150,000.00) Dollars is fully paid. The time when said royalties shall be paid, and the manner how the same shall be paid, shall be decided and determined at the said meeting. That the parties hereto shall not be liable to said Alfred L. Eacrett as stockholders, officers, individually, or otherwise". (The words "the said meeting" referred to the proposed reorganization meeting of the corporation.) There are other details of this contract of December 8, 1928, which apparently do not require attention here.

From the facts thus far stated it appears that on the fourteenth day of October, 1927, the patent was owned, one-third by Eacrett and two-thirds by Zimmon, the legal title being in the name of Eacrett. At about that time Zimmon sold, as he described it, "half of my interest in the patent and half of my interest in the capital stock" of the corporation, for the agreed price of $70,000, to one Jack Berman. A contract between them was executed, the terms whereof are not in evidence. At the same time, October 14, 1927, Berman paid to Zimmon $35,000, one-half the agreed price. Louis Berman, who represented Jack Berman in the negotiations, testified (Rep. Tr., p. 84), that Jack was to buy fifty per cent of the patent rights, which Zimmon claimed to own completely, and fifty per cent of the stock

of the corporation. Soon afterwards, at the instance of Berman, the October contract was destroyed, and a new contract, dated December 29, 1927, was substituted, wherein Berman's brother-in-law, Drusin, was named as purchaser instead of Berman. In this contract of December 29, 1927, there is a recital of payment of the $35,000 (more precisely, $35,054.83), and an agreement to pay the remaining $35,000 on or before January 1, 1928. The property sold was described as one-half of Zimmon's interest in the patent and in the shares of stock, and showed on its face that Eacrett owned 25,000 shares (which last-named shares were not part of the property being sold). The contract also contained provisions covering the contemplated loan of additional funds by Drusin to the corporation. The second $35,000 was paid to Zimmon "early in January".

On or before the eighth day of November, 1927, under the terms of the contract then in force between Eacrett and Zimmon, Eacrett was under obligation to transfer the patent to the corporation, but only upon receiving payment of the $30,000 which Zimmon had agreed would be paid by the corporation. Nevertheless, Eacrett transferred to Zimmon the entire patent, including the one-third interest at that time belonging to Eacrett. How was Eacrett persuaded to make this transfer without at the same time receiving his $30,000? On this point, since there is a conflict in the evidence, we must accept the testimony of Eacrett, as far as it goes in support of the decision of the trial court. According to this testimony, Eacrett had no information concerning the Berman purchase, whereby Zimmon had received half of the above-mentioned $70,000. A few days after the signing of the contract of September 3, 1927, Zimmon told Eacrett that "upon the assigning of the patent over to him (Zimmon), I was to get the $30,000.00 in the latter part of November". Zimmon said, "I will have the money for you the latter part of November, sure." This is the only statement or promise said to have been made by Zimmon until after the assignment of the patent on November 8th. On that day, "after we signed up", Zimmon again said, "the latter part of November, you will get your $30,000.00". But the money was not paid. In the latter part of November, Zimmon assured Eacrett that the money would be paid at Christmas. At Christmas Zimmon said, "To tell you the truth I can't

make it. I will have it for you by the first of the year."
In January he gave a similar assurance. It is to be remembered that the contract of September 3, 1927, contemplated payment of this money by the corporation when formed. The incorporation actually did take place in September. The contract expressly exempted Zimmon from personal obligation to make the payment. In the various promises and assurances given by Zimmon we can find nothing which amounts to an assumption of such liability. The sale to Berman or to Drusin of an interest in the patent did not include any interest of Eacrett therein. It was only a sale of a part of Zimmon's interest in the patent and of his stock in the corporation. If Zimmon concealed from Eacrett the fact that he was selling for a great price a part of the property thus owned by Zimmon, such concealment did not constitute a breach of any obligation. This evidence wholly fails to show that at any point or period in the course of the transactions Zimmon personally agreed to pay any money to Eacrett, or that Eacrett obtained any interest in the moneys paid to Zimmon by Berman or by Drusin.

It may be that, as testified by Louis Berman (brother of Jack Berman), appellant Zimmon told the Bermans that he was paying $70,000 for the patent. And it may be that, as the witness further testified, appellant told him, after receiving the first $35,000, that he had paid that money to respondent, and needed the balance for the same purpose. Such misrepresentations possibly might be a ground of complaint by Jack Berman, but they have no relation to respondent's case here. In brief, it must be concluded that Zimmon did not become indebted to the plaintiff for any money "had and received by the defendant to and for the use of the plaintiff". The finding of the court in favor of the plaintiff on that issue is not sustained by the evidence.

The judgment is reversed.

Houser, J., and York, J., concurred.